Morgan, J.
Van Norden, one of the defendants, is sued on a promissory note for $2500. The note is dated'New Orleans, thirteenth June, 1874, and is payable seven months after date. Palmer, the other defendant, is sued as guarantor that the note would be paid at maturity. The execution of the note is admitted. The defense is, .as to the maker, that it was given without any legal or valid consideration, and that the transaction or contract under which the note was given was *474 illegal, reprobated by law, and of no effect. Palmer pleads, first, tbe general issue, and second, be adopts Yan Norden’s answer.
The litigation grows out of transactions connected with the Missis sippi and Mexican Gulf Ship Canal Company, a corporation established by the Legislature. In 1871 the Legislature passed an act entitled “An act for the drainage of New Orleans.” See acts of 1871, p. 75. The first section of this act provides that the Mississippi and Mexican Gulf Ship Canal Company shall be authorized and empowered to excavate drainage canals and build protection levees within the then corporate limits of New Orleans and Carrollton, under certain conditions and stipulations therein expressed. Other sections mapped out the work which was to be done by the company. It was on the largest possible scale. One canal and protection levee was to be built near the shore of Lake Pontchartrain ; the canal was to be not less than sixty-five feet wide on the surface and fifteen feet deep in the middle-The protection levee was to be not less than one hundred feet wide, and of sufficient height to completely protect the city from overflow from Lake Pontchartrain. Another canal and protection levee was authorized to be built below the city to connect the lower end of the protection levee, along the lake, with the Mississippi river, of a sufficient size to fully protect the city from overflow, and to construct a like canal and protection levee above the city. The company was also authorized and empowered to excavate canals of the dimensions and at such localities as might be fixed by the board of administrators of the city as were necessary to fully drain the area bounded by the protection levees contemplated by the act. The company was also authorized to dig all the smaller canals required for the drainage of New Orleans and the lands in the rear of the city, the required width of which would be ten feet or more in width.
During the prosecution of these works, the board of administrators were required to build and run all the pumps and draining machines necessary to lift the drainage water from the canal or canals over into Lake Pontchartrain, and to keep the water in the canals in process of excavation, so far as practicable, at the proper level for the work of excavation, and at the same time assist the drainage of the adjacent lands. The eighth section of the act provided that at the end of every month, the city surveyor, or an engineer appointed by the board of administrators for that purpose, should examine the work which had been done by the company during that month, and upon a measurement of the width and depth of the canal, canals, or parts of canals dug, and protection levees built, certify as to the number of cubic yards excavated and the number of cubic yards of protection levees built during the said month. It was made the duty of the administra *475 tor of accounts, on the presentation to him of the certificate of the city surveyor or engineer, by the president of the company, to draw a warrant or warrants on the administrator of finance, in payment of the work done, at the rate of fifty cents per cubie yard of excavation, and fifty cents per cubie yard for the protection levee, the warrants to be of such denomination as might be required by the president of the company. It was made the duty of the administrator of finance to pay these warrants on presentation, and should there not be any funds in the city treasury, he was required to indorse upon the same the date of presentation, after which date the warrant or warrants were to bear interest at the rate of eight per cent, per annum until paid.
On the twenty-second May, 1872, the company, through its proper and authorized officer, by public act, declared that Whereas they had always been paid in warrants for the work done by them, which Warrants were only convertible to cash at a discount of twenty-five per cent, and more; whereas the expenditures of the company in constructing and executing their work have tobe paid in cash; and whereas, Warner Van Norden has agreed to advance to the company during the ensuing twelve months $150,000, to meet the expenses of their work, the $150,000 to be given in such installments as may be deemed necessary as the work progresses; therefore, to secure the payment of this loan, together with the interest thereon, the company transferred to Van Norden its rights and advantages granted under the act of the Legislature above quoted, as well as to all sums of money, profits and benefits that might inure or be realized by virtue of the performance and execution of the work therein provided for; and the company agreed to transfer to Van Norden all certificates, cash, warrants or bills that might be made out and delivered by the surveyor or other officers of the city for all work done by the company.
On the twenty-second November, 1872, the company, by public act, acknowledged itself indebted to Van Norden in the sum of $161,962 86, advanced by him, to the company to enable it to do the work required of it under the act of the Legislature. In part payment thereof it transferred to him certain property estimated at $50,000. This left the debt due him $111,962 86.
Benner was a director in the company. So was one Champlin. Benner frequently said to Van Norden, as is to be gathered from the testimony in the record (uncontradicted by him when on the stand), that Van Norden had what he, Benner, called “a big thing,” and that “he wanted some of it;” that some of the money received for the work done for the city should come to him; that he had got it all fixed, and that if Van Norden would come down and fix it as he wanted, he would make every thing all right; if not, he would lose by it.
*476 To these appeals and threats Yan Norden seems to have turned a deaf ear. Champlin then instituted proceedings in the United States courts to force the company into bankruptcy. He was a director in the company, a stockholder and a creditor. His stock consisted of two hundred shares of $100 each. His credit was the company’s warrants for $1500. It was upon this last that the proceedings in bankruptcy were commenced. The act of bankruptcy, as alleged, was the sale of the company’s property to Van Norden, on the twenty-third of November, 1872.
Then commenced the publication of a series of articles in one of the public papers of this city, in which Van Norden’s conduct was severely criticized, and in which many things damaging to the character'of any man were boldly charged against him. They were conspicuously published, and attention called to them by their almost startling headings. In one of the articles it was stated that in the month of December preceding, the company had reached a condition which was regarded by the directors as one of hopeless bankruptcy.
By themselves these articles would amount to but little, and one of them would rather indicate that Champlin did not know anything about them. In one oí them it is stated: “ A director, Mr. Champlin, nest enters the field as a contestant for honors in this delectable squabble. We know nothing to this gentleman’s prejudice, and therefore can not say that his petition to place the company in the bankruptcy court resulted from disappointment, or because he did not share as liberally as more enterprising men did. Be this as it may, he has done so, and thus paved the way for a full disclosure of the affairs of this horribly managed company.”
But the author of these articles, a writer on the paper in which they were published, was examined as a witness with regard to them. He tells us that he was in the Customhouse on one occasion, when his attention was called to these proceedings in bankruptcy by Champlin. The first article, ho thinks, if not the second, was written at Benner’s house, that is, chiefly written there. He wrote in their presence, consulting with them, Benner aud Champlin, as to the facts. "They were both present, and when it was all prepared, they revised the copy, read it over, and corrected it, making some changes in it.” So that all the public knew of the inside workings of the company was disclosed to the reporter by Champlin and Benner — Champlin, the plaintiff in the bankruptcy proceedings; Benner, the plaintiff in this suit, and both of them stockholders of, and directors in, the company whose affairs, according to them, had been so horribly managed that it was hopelessly insolvent.
And so the conflict waged. Van Norden was pitilessly attacked in *477 the public prints. This was a serious matter, not only as an individual, but because of a position of great trust which he held, viz: President of a savings bank. Besides this, he saw his enormous debt of over 8100,000 figuring on the debit side of a bankrupt company’s schedule, and he saw a likelihood of the property which had been, transferred to him going into the hands of an assignee in bankruptcy. It seems to be conceded on all hands that in such an event there would have been an end of it all. Just then propositions for negotiating were made to him. Benner held 1620 shares in the stock of the company. The transaction was a simple one. Van Norden was to purchase Benner’s stock, and Benner was to see that Champlin’s proceedings to force the company into bankruptcy should be dismissed. And so it was done. Van Norden gave him six notes for $2500 each, payable at various dates, and caused two of them to be discounted, thus paying him in cash $5000, and giving his notes of $2500 each for the balance. Benner then bought Champlin’s stock for $4000 — about twenty dollars a share — and the suit in the bankrupt court was discontinued. The suit now before us is on one of the $2500 notes.
In our opinion the evidence in the record shows that from first to last Benner was acting with the sole desire of forcing money out of Van Norden without any pretence of right thereto; that the stock which he made the pretext for his attempt was worthless when he made it, and was only a subterfuge to cover his original determination to get something from Van Norden to which he had no right. In our opinion courts of justice were not made to settle controversies standing on such a basis, and that their doors should be barred to such suits and suitors.
In regard to the defendant Palmer, he was bound only as surety. The principal obligation being declared null, the surety is discharged.
It is therefore ordered, adjudged and decreed, that the judgment of the district court be avoided, annulled and reversed, and that there be judgment in favor of the defendants, with costs in both courts.